UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF CONNECTICUT

| | | |
|---|---|---|
| William A. Parks | : | NO. 3:09-cv-01162(WWE) |
| Plaintiff, | : | |
| | : | |
| V. | : | |
| | : | |
| USA, et. al | : | |
| Defendants | : | July 13, 2012 |

# Exhibit A

# Full page copies of referenced pages from Plaintiff's Deposition



**NOBLE, SPECTOR & O'CONNOR, P.C.** • ATTORNEYS AT LAW
ONE CONGRESS STREET • HARTFORD CT 06114-1067 • JURIS NO. 409138 • TEL: (860) 525-9975 • FAX: (860) 525-9985

UNITED STATES DISTRICT COURT

DISTRICT OF CONNECTICUT

* * * * * * * * * *

WILLIAM A. PARKS, *

Plaintiff, *

VS. *

*

MARSHALL SEGAR, OFFICER T. LYNCH and GREGORY JACOBSON, *

Defendants. *

* * * * * * * * * *

COPY

CIVIL ACTION NO. 3:09-CV-01162 (WWE)

New Haven, CT

January 23 , 2012

1:10 p.m.

**DEPOSITION OF WILLIAM A. PARKS**

APPEARANCES:

FOR THE PLAINTIFF:

LAW OFFICE OF JOHN R. WILLIAMS & ASSOCIATES
BY: ROSE LONGO-MCLEON, ESQ.
51 Elm Street
New Haven, CT 06510

FOR THE DEFENDANTS MARSHALL SEGAR AND OFFICER TODD LYNCH:

LAW OFFICE OF PETER D. CLARK
BY: PETER D. CLARK, ESQ.
525 Bridgeport Avenue
Shelton, CT 06484

(Continued)



DCY
CMA8156

FEB 01 2012

APPEARANCES: (Continued)

FOR THE DEFENDANT OFFICER GREGORY JACOBSON:

NOBLE, SPECTOR & O'CONNOR, P.C.
BY: DAVID C. YALE, ESQ.
One Congress Street
Hartford, CT 06114

Deposition of WILLIAM A. PARKS, the Plaintiff herein, taken on behalf of the Defendants herein, for the purpose of discovery and for use as evidence in this cause, pending in the United States District Court for the District of Connecticut, pursuant to Notice, before Lorraine Calegari, Licensed Shorthand Reporter, No. SHR. 172, and a Notary Public within and for the State of Connecticut, at the law offices of John R. Williams & Associates 51 Elm Street, New Haven, CT on January 23, 2012 at 1:10 p.m., at which time counsel appeared as hereinbefore set forth . . .

PARKS - DIRECT - CLARK

Q. Okay.

A. I spoke to one of his representatives and they transferred me to his voicemail.

Q. So you left a voicemail for this individual; is that correct?

A. On every occasion I called down there for him I did, yes.

Q. Okay. And what was the voicemail message or messages that you left for him?

A. Well, by what I believe may have been the fourth time I called him with no previous response, my voicemail to him was somewhat terse in that I said to him something along the lines of, you know: You need to get back to me, man, because, you know, if you don't get back to me, I'll call your superior and I'll bring smoke down on you, which is a common vernacular for I'll subject you to disciplinary action. You know, it's vernacular on the streets and even in the military.

And then I said something in the spirit of what Obama was saying about running a government,

PARKS - DIRECT - CLARK

if I'm on the phone, if somebody comes to the door in that particular house, I could easily hear it.

Q. And why is it that you didn't go out of your house to speak with the officers?

A. Well, hey, you know, I mean I kind of knew it was imminent. And, again, with my small knowledge of the law in that respect, I knew that based on what they wanted to charge me for, that they wouldn't be able to come into the house unless I invited them in.

They were charging me for a misdemeanor. They didn't have a warrant at all. So they were there unlawfully.

I mean I knew as a police officer in any state, you cannot go out of your jurisdiction and make a criminal arrest without a warrant.

I mean cops who graduates from the academy know that. Rookies know that. Lynch ain't a rookie. Segar ain't a rookie.

And the Montville cops weren't rookies either because they had several supervisors there, at least two sergeants there.

PARKS - DIRECT - CLARK

living room with Officer Lynch?

A. I did everything they told me to do. Yes, I walked out into the living room. They placed ME in mechanical restraints, handcuffs.

Q. Where, in the bedroom or in the living room?

A. No, in the living room.

Q. Okay.

A. And then your client, Lynch, after I was in handcuffs, restrained, I told him I was handicapped and disabled and to take it easy on me. Lynch sic'ed his little pigmy German Shepard on me, whose name is Sasha, I guess, because it's on the side of the cruiser with quotations.

Q. Okay. Were you handcuffed behind you or in front?

A. I was handcuffed behind me. And after I told them take it easy on me, I'm handcuffed and disabled, my car was parked in the driveway with a blue placard hanging up, a handicapped plaque, so you'd have to be a total idiot not to believe me.

PARKS - DIRECT - CLARK

A. I was wearing shorts.

Q. Bermuda shorts?

A. I don't know what kind of shorts. They were shorts.

Q. The question then is: Did it tear your Bermuda shorts?

A. No. I mean I had enough leg exposed that he bit me, I think it was, probably in the mid to lower thigh.

Q. Okay. And then what occurred?

A. Well, then I was led outside through the front door and they wanted to put in one of their Montville cars, Jacobson's car of all people.

And on the way to Jacobson's car, from behind Lynch pushed me to the ground and started beating with his asp.

Q. Okay.

A. That's not okay. Don't ever say that that's okay.

Q. You were saying that when you were walking from the front door to Officer Jacobson's police cruiser, Officer Lynch --

A. From behind pushed me to the

PARKS - CROSS - YALE

Q. Did you do that yourself or did you have a carpenter come in?

A. We had somebody come in. Actually, my roommate actually did it because he was pretty handy with stuff like that. And he had somebody come and help him.

Q. Then you said it was several hundred dollars?

A. Three, $400. They also had to replace the pane in the door that Lynch had knocked out.

Q. Now you've also talked about the assaults that were made against you. The first one you said occurred at your house, between your house and the police cruiser you were headed to?

A. That's correct.

Q. When that took place, where was Officer Jacobson?

A. I don't know. I mean I believe that he was proximate to his car, because as soon as I got into the car, you know, he jumped into the car. So he had to be close by somewhere.

PARKS - CROSS - YALE

Q. How far were you from his car when you fell, when you went to the ground?

A. Fifteen feet maybe.

Q. So as best you can establish, Jacobson was about 15 feet away the first time you went on the ground?

A. Yeah, I mean he was always around. He was a part of this.

Jacobson was the one who actually, you know, knew that I was New London's most wanted that day. And he was the one that alerted them to send Lynch back up there. You didn't ask me about that. I later on found that out.

He went riding by my house and saw my car was there. And he was the one who alerted New London police to come up there.

Jacobson plays a pivotal role in this whole thing. His name is all over this.

Q. Now you say that the officers kicked some doors in. Do you know which officers kicked the doors in your house?

A. I don't know as a matter of fact.

Q. Do you know where Officer Jacobson was when the doors were being kicked in?

PARKS - CROSS - YALE

A. I know where he was when the door was kicked in.

Q. Okay. Where was he when your door was being kicked in?

A. Right beside Officer Lynch.

Q. And did Officer Lynch have his canine with him when they came into your bedroom?

A. The canine was out in the living room. Sasha is the name of the dog. Pigmy dog for pigmy cops. They don't give pigmy cops a real dog.

Q. The bite that you got on your thigh, did it leave any scars?

A. Not that I know of.

Q. Did it leave any permanent injury?

A. Not that I know of.

Q. Now also in your complaint you talked about bruises that you've sustained. Did you have bruises after the first assault?

A. I presume that I did. I know that after the first and the second one I was all marked up and bruised up.

PARKS - CROSS - YALE

Q. Let me skip ahead, it might help me with my questions.

The second time you were assaulted in the New London was Officer Jacobson present?

A. He had to be present in the garage because he drove his car into the sally port.

Q. Did the assault take place in the sally port or in the holding area?

A. Well, I mean it started in the sally port.

Q. Do you know where Officer Jacobson was when it started?

A. I would presume he was just feet away, because he drove the car in there.

Q. Not what you presume, but did you see him?

A. I was distracted from seeing him or anybody but those three or four officers that used excessive force in kicking me out of the car.

Jacobson was not a part of those three. They were all New London officers.

Q. What I'm trying to establish is how

PARKS - CROSS - YALE

far away he might have been at that time, if you know or not?

A. I know Mr. Yale what you're trying to do. Jacobson, he was in California, man. He had nothing to do with this.

Q. But for the answer to my question: Do you know how far away Officer Jacobson was?

A. That's good, man, you're very good.

I don't know as a matter of fact how far away he was. Was he there? Yes, he was. Obviously, he was there, because he drove the car in there

Q. Now going back to the first part that happened out by your house. You said that Officer Lynch hit you several times with the asp. I think you said three to five times?

A. I didn't count, but it was a number of times, yeah, at least three times.

Q. Can you estimate from the time you went to the ground until the last time you were hit with the asp how many seconds elapsed?

PARKS - CROSS - YALE

A. Five seconds. Less than ten seconds. Doesn't take a long time to hit somebody three or four or five times with an asp.

That's the first time. Once I got back up again and was trying to get in the car with the assistance of these two Montville cops, you know, Lynch started wailing on me again. So you need to specify which --

Q. When you were on the ground before you got to the police car, did the asp strikes come right together quickly or were they spaced out?

A. They were one right after the other. It was like somebody banging a hammer.

Q. And then you said that some officers helped you up?

A. Yeah.

Q. And they were putting you into the police cruiser?

A. They were assisting me into the car.

Q. Your testimony is that Officer

PARKS - CROSS - YALE

Lynch came up again and hit you again with the asp?

A. Yeah, that's when he accused me of interfering.

And, actually, in defense of the Montville officers who are named as Defendants here, all of the Montville Police Department is, they shouldn't have let that happen. Okay.

They actually pushed him off because they knew he shouldn't be doing that stuff.

Q. Your testimony was he hit you the second time at the cruiser. Where was officer Jacobson then?

A. I don't know. He wasn't in California, I could tell you. He had to be somewhere proximate to that.

Q. And when you say "He had to be somewhere proximate," what are you basing that on?

A. That's his car. He was doing the transporting. They put me in the right rear of the car. So as far as I knew, Jacobson was probably just standing outside the driver's door.

PARKS - CROSS - YALE

mechanically restrained. He offers no threat at that point. Okay. So it's over.

And I told them, you know, I'm physically handicapped and disabled. Take it easy on me. And that's when Lynch said something to his dog, which was standing beside him, and caused the dog to lurch out at me and bite me in the thigh.

Q. Was it just one bite?

A. Just one bite. The dog went up there like that (indicating.)

Q. How long do you think that lasted until the dog let go?

A. Gee, approximately a second, half a second.

Q. A bite and he let go right away?

A. Yeah, pretty much. Like this (indicating).

Q. And you might know my next question. Where was Officer Jacobson when that happened?

A. How do I know that? He was standing where the whole bunch of them.

Q. How far away from you?

A. Oh, probably only two, three, maybe

PARKS - CROSS - YALE

four feet away at the time.

Could Jacobson have done something to stop this? Absolutely

Q. What could he have done to stop this?

A. Well, he didn't have to call the New London police when he saw that New London's most wanted car was parked in the driveway on Maple Avenue. He didn't have to do that.

Q. Okay.

A. He should have done some investigation and said: What do you want this guy for? Oh, second degree threatening. Oh, I thought he may have robbed a bank or something the way you're talking.

If that were me, okay, as a police officer many, many years ago, I would have done that. I would have called down New London and said: Hey, what are we doing with this guy? You got a warrant?

That's the first thing, if a cop comes into my jurisdiction and wants to arrest one of my people, I need to see a piece of paper.

CLARK - CROSS - LONGO-MCLEON

Q. Is it your testimony that Jacobson wasn't present when Lynch hit you?

A. No. He was there.

Q. Okay.

A. How far away from me, you know, again, whether there were leaves on the trees that day, I really have no idea.

Q. Well, when you were coming out of the house --

A. He had to be there. He drove the car down from New London.

Q. Okay. When you were coming out of the house going towards Jacobson's car, you testified that Lynch was behind you --

A. Lynch pushed me to the ground.

Q. -- and lynch pushed you to the ground, it's your recollection that Jacobson was in the proximate area?

A. He was in the proximate area, yeah.

Q. And when you pulled into the sally port at the New London Police Department, you said that Lynch and some other New London officers were wailing on you when you were still in the car.

CLARK - CROSS - LONGO-MCLEON

A. Yeah, they were pulling on me.

Q. Was Jacobson in the car?

A. Yeah, Jacobson was on the other side of the car. He just pulled the car in, so he was on the other side of the car.

He was not with those three or four New London officers. It was Lynch and two or three other officers.

Q. How much time though had passed from the time that Jacobson pulled the car into the sally port until those New London officers were wailing on you?

MR. YALE: Objection to form.

MR. CLARK: Same objection.

Q. How long was it?

A. It was just a couple of seconds. He immediately opened the door, reached in, grabbed me. I didn't have much of a chance to do anything.

Q. So as you sit here today, to your best recollection was Jacobson in the proximate area when you were beaten by the New London police?

A. He had to be. He had to be. He

CLARK - RECROSS - YALE

didn't walk across the street for a coffee. You know, Jacobson owns a good piece of this.

MS. MS. LONGO-MCLEON: Okay. I have no other questions.

MR. CLARK: No questions.

MR. YALE: I have some follow-up.

RECROSS-EXAMINATION BY MR. YALE:

Q. You were asked a couple times about Officer Jacobson being in the proximate area. How do you define the phrase "proximate area"?

A. He was within a few feet, 10, 15 feet. He had to be. Jacobson like his counterparts in Montville could have, you know, protected me from Lynch.

I blame the Montville police officers for acquiescing to this little idiot, pigmy idiot from New London coming up there without a warrant and giving him carte blanche. That's exactly what they did.

And no police officer that I know including myself many many years ago would have allowed that

to happen. That should never have happened.

So Montville owns this. Jacobson, Montville, the town of Montville, the Montville Police Department, whoever you want to put the label on, they own this, because nobody should have allowed that to happen.

THE COURT REPORTER: Please slow down.

A. (Continuing.) The first thing a police officer should have done -- a supervisor, they had supervisors there, two supervisors, two sergeants -- should have asked him for a piece of paper. Without that piece paper, it's a done deal.

Q. I think you need to speak a little more slowly for the court reporter.

A. I'm just saying he shouldn't have been there, man. He had no jurisdiction whatsoever.

Q. Now I want to run over something for a second here because I want to make sure I understand your testimony correctly, because it may be conflicting in my head.

You testified that Lynch knocked you

CLARK - RECROSS - YALE

down at your house, correct?

A. Yeah.

Q. And the first time I asked you, I thought you said you didn't know where Jacobson was when Lynch did that.

A. I said I didn't know exactly where he was. Counsel then asked me: Was he in proximity? Well, obviously, if he drove the car down, he had to be in proximity. He had come out of the house with me and Lynch.

Q. Prior to being pushed by Lynch, when was the last time you had seen Officer Jacobson?

A. I saw him in my peripheral vision when we came out of the house.

Q. And how far were you from the house when you got knocked down?

A. Probably about 30 feet to the car so probably halfway, about 15 feet.

Q. And during the time you traveled that 15 feet, at any time did you see Officer Jacobson?

A. No, I didn't see Lynch either, but I know that Lynch and Jacobson were behind

CLARK - RECROSS - YALE

me.

Q. When you got to New London, my understanding is when you pulled into the sally port, your testimony was several New London police officers immediately tried to grab you out of the cruiser?

A. They did grab me out of the cruiser.

Q. And Officer Lynch was at the other side of the vehicle at the driver's door?

A. Yeah. I just saw him peripherally when I looked to the side when I first tried to get out of the vehicle.

Q. When they were trying to get you out of the car, did they strike you?

A. No. They just pulled on my shirt very hard and tried to get me out of the car a lot faster than I was capable of coming out of the car.

Q. And then the second complaint you've testified to happened, as I recall, not in the sally port but in the booking area in New London?

A. Yeah.

Q. And my recollection is that you said you never saw Officer Jacobson come inside the booking area?

A. No. He got back in his car and left presumably.

MR. YALE: Thank you. I have no further questions.

MS. LONGO-MCLEON: Now I have one question to clarify in my mind.

RECROSS-EXAMINATION BY LONGO-MCLEON:

Q. There is a time, I believe you testified, that you were in Jacobson's car and was it Lynch that was striking you?

A. Yeah.

Q. Was that back at your Montville home?

A. That was back at my home.

Q. And where was Jacobson when Lynch was beating on you in your car?

A. I don't know exactly where, but he was close by. All the Montville officers were close by.

Two of them were standing right in the opening of the door when Lynch reached in and